CASE NO. 19-4553

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

————————————

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

THOMAS WALTER GILLEN,

*Defendant - Appellant,*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT CHARLOTTESVILLE

————————————

**OPENING BRIEF OF APPELLANT**

————————————

David A. Eustis
EUSTIS & GRAHAM, PC
P. O. Box 2195
609 East High Street
Charlottesville, VA 22902
434-293-9900
eustisandgrahamlaw@earthlink.net

*Counsel for Appellant*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF JURISDICTION .................................................................1

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ............................2

STATUTORY BACKGROUND .....................................................................3

STATEMENT OF THE CASE .......................................................................6

SUMMARY OF ARGUMENT ......................................................................9

ARGUMENT ...........................................................................................11

    I.     The Anti-Riot Act is unconstitutionally overbroad because it clearly regulates a substantial amount of constitutionally protected speech and assembly. It is further so vague that it fails to put a person on adequate notice of what will constitute contravention of the Act ...........................11

    II.    The Anti-Riot Act is unconstitutional as applied to Appellant Gillen .....24

CONCLUSION ........................................................................................28

ORAL ARGUMENT STATEMENT ...............................................................28

CERTIFICATE OF COMPLIANCE ...............................................................29

CERTIFICATE OF SERVICE .......................................................................30

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ..........................................9

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)...................................................... *passim*

*Carter v. United States*, 417 F.2d 384 (9th Cir. 1969) ..............................................5

*City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984)..................................20

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .....................................................23

*Coates v. Cincinnati*, 402 U.S. 611 (1971)......................................................22, 27

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ............................20

*Hess v. Indiana*, 414 U.S. 105 (1973)..............................................................10, 17

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .............11

*Houston v. Hill*, 482 U.S. 451(1987) ......................................................................21

*In re Shead*, 302 F. Supp. 560 (N.D. Cal. 1969).................................................5, 16

*Kolender v. Lawson*, 461 U.S. 352 (1983)...............................................................23

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)................................9, 19

*Nat'l Mobilization Comm. To End War in Viet Nam v. Foran*,
411 F.2d 934 (7th Cir. 1969) ....................................................................................5

*New York Times v. Sullivan*, 376 U.S. 254 (1964) .................................................11

*Sessions v. Dimaya*, 138 S.Ct. 1204 (2018).............................................................23

*United States v. Chapman*, 666 F.3d. 220 (4th Cir. 2012) ...............................25, 26

*United States v. Dellinger*, 472 F.2d 340 (7th Cir. 1972)...............................*passim*

*United States v. Hoffman*, 334 F. Supp. 504 (D.D.C. Nov. 23, 1971).....................5

*United States v. Miselis*, No. 19-4550 (4th Cir. 2020) .....................................*passim*

*United States v. Moore*, 666 F.3d.313 (4th Cir. 2012) ...........................................24

*United States v. Williams*, 553 U.S. 285 (2008) ...............................................11, 20

*Virginia v. Hicks*, 539 U.S. 113 (2003) ...................................................................11

## **Statutes**

18 U.S.C. § 231 ....................................................................................................16
18 U.S.C. § 922 ......................................................................................................1
18 U.S.C. § 2101 ............................................................................................*passim*
18 U.S.C. § 2102 ............................................................................................*passim*
18 U.S.C. § 3231 ....................................................................................................1
18 U.S.C § 3742 .....................................................................................................1

## **Other Authorities**

*The Federal Riot Act and the First Amendment*,
5 Harv. C.R.-C.L. L. Rev 393 (1970) L. Rev. 897 (1975) .....................................18

*The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory*, 20 Villanova L. Rev. 897 (1975) ..............................................................19

## <u>STATEMENT OF JURISDICTION</u>

The district court had jurisdiction over these criminal prosecutions under 18 U.S.C. §§ 922, 3231. The district court sentenced Appellant on July 19, 2019 and entered final judgment on July 26, 2019. JA 275-281. The Appellant filed a timely notice of appeal. JA 282-283. This Court has jurisdiction under 18 U.S.C. § 3742 over this timely appeal from a final order.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The Appellant in this case was a member of the Rise Above Movement ("RAM"), which self-identifies as white nationalists. Appellant was indicted in the Western District of Virginia along with three co-defendants. Other members of RAM were prosecuted simultaneously in the Central District of California, also under the Anti-Riot Act. The district court below denied Appellants' motion to dismiss the indictment on the grounds that the Anti-Riot Act is facially unconstitutional, and unconstitutional as applied to Appellant Gillen, while the district court judge in the Central District of California declared the statute unconstitutional and dismissed the cases.

This appeal presents two issues:

1)    Does the Anti-Riot Act regulate a substantial range of constitutionally protected speech and assembly such that it is unconstitutionally overbroad? A corollary to this is whether the vagueness inherent in the language of the Ant-Riot Act is constitutionally infirmed.

2)    Is the Anti-Riot Act unconstitutional as applied to Appellant Gillen?

2

# STATUTORY BACKGROUND

*The Anti-Riot Act, 18 U.S.C. § 2101*

> (a) Whoever travels in interstate or foreign commerce or uses any facility of interstate or foreign commerce, including, but not limited to, the mail, telegraph, telephone, radio, or television, with intent—
>
>> (1) to incite a riot; or
>>
>> (2) to organize, promote, encourage, participate in, or carry on a riot; or
>>
>> (3) to commit any act of violence in furtherance of a riot; or
>>
>> (4) to aid or abet any person in inciting or participating in or carrying on a riot or committing any act of violence in furtherance of a riot;
>
> and who either during the course of any such travel or use or thereafter performs or attempts to perform any other overt act for any purpose specified in subparagraph (A), (B), (C), or (D) of this paragraph—
>
> Shall be fined under this title, or imprisoned not more than five years, or both.

In short, the Anti-Riot act criminalizes:

- ☐ Engaging in a **Commerce Event** – either travel in, or use of a facility of commerce

- ☐ With the **Intent** to Engage in **Riot-Related Activities** (subsections (1)-(4)) – an intent that must exist at the time of the Commerce Event

- ☐ Where there is an **Actual or Attempted Overt Act** – which may occur at any time during or after the Commerce Event, and must be for any purpose specified as **Riot-Related Activities** (subsections (1)-(4)).

3

The Anti-Riot Act also contains the following:

(b) In any prosecution under this section, proof that a defendant engaged or attempted to engage in one or more of the overt acts described in subparagraph (A), (B), (C), or (D) of paragraph (1) of subsection (a) and (1) has traveled in interstate or foreign commerce, or (2) has use of or used any facility of interstate or foreign commerce, including but not limited to, mail, telegraph, telephone, radio, or television, to communicate with or broadcast to any person or group of persons prior to such overt acts, such travel or use shall be admissible proof to establish that such defendant traveled in or used such facility of interstate or foreign commerce.

(c) Nothing contained in this section shall be construed to make it unlawful for any person to travel in, or use any facility of, interstate or foreign commerce for the purpose of pursuing the legitimate objectives of organized labor, through orderly and lawful means.

Finally, 18 U.S.C. § 2102 sets out these Definitions:

(a) As used in this chapter, the term "riot" means a public disturbance involving (1) an act or acts of violence by one or more persons part of an assemblage of three or more persons, which act or acts shall constitute a clear and present danger of, or shall result in, damage or injury to the property of any other person or to the person of any other individual or (2) a threat or threats of the commission of an act or acts of violence by one or more persons part of an assemblage of three or more persons having, individually or collectively, the ability of immediate execution of such threat or threats, where the performance of the threatened act or acts of violence would constitute a clear and present danger of, or would result in, damage or injury to the property of any other person or to the person of any other individual.

(b) As used in this chapter, the term "to incite a riot", or "to organize, promote, encourage, participate in, or carry on a riot", includes, but is not limited to, urging or instigating other persons to riot, but shall not be deemed to mean the mere oral or written (1) advocacy of ideas or

4

(2) expression of belief, not involving advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts.

*Statutory History*

Congress enacted the Anti-Riot Act as a rider to the Civil Rights Act of 1968 at the height of public advocacy over civil rights and the Vietnam War. Between 1968 and 2018, only four reported cases involve the Anti-Riot Act in any detail, three that are related to the Chicago Seven who were prosecuted for their participation in a protest of the 1968 Democratic National Convention, and the fourth was a response to a declaratory judgment action brought by the Black Liberation Movement in 1969. *See Dellinger*, 472 F.2d 340 (7th Cir. 1972) (overturning convictions of the Chicago Seven while upholding the constitutionality of the Act 2-1); *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969) (declaratory judgment about Anti-Riot Act in proceeding related to *Dellinger*); *United States v. Hoffman*, 334 F. Supp. 504, 509 (D.D.C. Nov. 23, 1971) (affirming constitutionality of act in ruling on motion for disclosure of records of electronic surveillance about one member of the Chicago Seven); and *In re Shead*, 302 F. Supp. 560, 565 (N.D. Cal. 1969) (upholding constitutionality of act in declaratory judgment brought by Black Liberation Movement), *aff'd on other grounds* in *Carter v. United States*, 417 F.2d 384 (9th Cir. 1969) (finding plaintiffs had no standing to

challenge constitutionality of the law).

## STATEMENT OF THE CASE

Appellant was arrested on October 2, 2018, in California on a criminal complaint out of the Western District of Virginia alleging a violation of the Federal Anti-Riot Act, 18 U.S.C. § 2101, and conspiracy to violate the same. JA 27. An indictment with the same two counts followed on October 10, 2018. JA 28. Appellant pled guilty to Count One of the indictment, conspiracy to violate the Anti-Riot Act, and the government dismissed Count Two. JA 155-168; 275. In a written plea agreement, Appellant reserved his right to appeal the constitutionality of the Anti-Riot Act. *Id*.

Less than two weeks after Appellant was arrested, four other men were arrested on a criminal complaint filed in the Central District of California, alleging the same two violations. *See United States v. Rundo, et al*, No. 2:18-cr-759 ("Rundo"). The California defendants, and the Appellant, were all alleged to be members of RAM who had travelled to various political rallies. Three other defendants were prosecuted in the Western District of Virginia. One pled guilty without challenging the constitutionality of the Anti-Riot Act.  The other two, Mr. Daley and Mr. Miselis, appealed separately in the consolidated *United States v. Miselis* No. 19-4550 (L).

The Federal Anti-Riot Act requires that a defendant either travel in

6

interstate commerce or use a facility of interstate or foreign commerce with the requisite intent. 18 U.S.C. § 2101. The RAM members who travelled to Charlottesville, Virginia, to participate in the Unite the Right Rally on August 12, 2017, were indicted in the Western District of Virginia alleging their travel from California to Virginia as the Commerce Event for Count Two, the Anti-Riot Act count. JA 33-34. Their participation in the prior California rallies was included as relevant overt acts to Count One, the Conspiracy count. JA 30-31.

The Appellant joined in and adopted the motion to dismiss the indictment filed by defendant Daley on February 1, 2019, arguing that the Anti-Riot Act was facially unconstitutional and that the Indictment had not sufficiently pled the charge. JA 61-62; 63-92. A similar motion was filed in the California cases. Appellant and two co-defendants made oral argument to the district court. JA 93-132. Three days later the district court below entered an order denying the motions. JA 133. On May 2, 2019, the district court issued a memorandum opinion explaining the district court's order and conclusion that the Anti-Riot Act was constitutional. JA 169.

Appellant was sentenced on July 19, 2019 to 33 months. Appellant filed a timely notice of appeal. JA 282. The Court entered an Order consolidating Appellant Gillen (19-4553) and Appellant Daley (19-4551) with Appellant Miselis (19-4550) (L). On August 23, 2019 the undersigned

counsel was relieved as counsel of record and the Court noted, *inter alia,* substitute counsel as counsel of record. On September 23, 2019 the Court granted substitute counsel's motion to deconsolidate Appellant Gillen from 19-4550 (L). Substitute counsel filed a brief and appendix. On January 2, 2020, pursuant to Appellee's request, the Court suspended briefing and subsequently re-appointed undersigned counsel as counsel of record for Appellant. On March 9, 2020 the Court, over Appellant's objection, placed Appellant's case in abeyance pending a decision in *USA v. Miselis, et. al.* On August 24, 2020 the Court filed a Published Opinion in *USA v. Miselis, et.al* (19-4550)(L) wherein the Court affirmed the judgment and convictions in the cases of Mr. Miselis and Mr. Daley.

In largely rejecting the reasoning of appellants in *USA v. Miselis,* the Court found that the Ant-Riot Act was not void for vagueness and did not violate due process. *Miselis, Id.,* at 38; 43. The Court struck the terms "promote", "encourage", "urging", as well as "involving" mere advocacy of violence, as well as certain other language. Otherwise the Court found the Ant-Riot Act "perfectly valid". *Miselis, Id.,* 36-37.

8

## <u>SUMMARY OF ARGUMENT</u>

The Anti-Riot Act is unconstitutional because it is overbroad. At its core, the First Amendment protects impassioned speech—particularly on issues of public debate. Indeed, full-throated speech is of great value to our democracy, and is especially important in the realm of political advocacy. This nation has a "profound national commitment to the principle that debate on public issues"— including politics and competing worldviews—"should be uninhibited, robust, and wide open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

This guarantee is so important that it covers inflammatory, racist, and offensive speech. "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002) (emphasis added). As a result, the First Amendment protects words and expression that may encourage or promote violence, as long as they fall short of incitement to violence.

In fact, the Supreme Court "has made clear . . . that mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927 (1982). It is undeniable that the Anti-Riot Act potentially intrudes profoundly on

constitutionally protected speech and assembly rights. This is highlighted by over breadth and vagueness. The principle of the 'Heckler's Veto' has an additional chilling effect on constitutionally protected rights of dissent and advocacy.

To distinguish between *advocacy* of violence, and *incitement* of violence, the Supreme Court has explained that the speaker, or actor, must have the intent to cause violence, that the risk of violence must be imminent, and that violence must be likely to actually occur. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Hess v. Indiana*, 414 U.S. 105 (1973). In contrast, the Anti-Riot Act punishes speech and expression without requiring intent, imminence, or likelihood. As a consequence the reach is sweeping, stretching back to the intention in a speaker's mind that may come weeks, or months before any "riot" (that need not ever occur). For these simple reasons, the Court must find the statute unconstitutional on its face.

In *USA v. Miselis, et. al,* Appellants made clear to the Court at oral argument that they waived any as-applied challenge and would rely solely on a facial challenge. *Miselis, et. al., Id.,* at 13-14. Indeed, appellants Miselis and Daley did not raise an as-applied challenge in oral argument before the district court. Appellant Gillen, on the other hand, did raise an as-applied challenge before the district court, and does so again in this appeal. JA 101-107.

10

# **ARGUMENT**

I.  **The Anti-Riot Act is unconstitutionally overbroad because it clearly regulates a substantial amount of constitutionally protected speech and assembly.  It is further so vague that it fails to put a person on adequate notice of what will constitute contravention of the Act.**

The Anti-Riot Act is unconstitutionally overbroad because it regulates constitutionally protected speech, and not just in a few hypothetical applications of the statute. By enacting this law, Congress criminalized much more than rioting. And much more than attempting to riot, or even intending to riot. Instead, Congress, as a direct result extended criminal consequences to speech and expression far removed from violence.

Numerous sources of vagueness within the statute are set forth below as separate constitutional defects. In addition, these ambiguities contribute to the unconstitutional overbreadth because a statute is overbroad when "it is unclear" whether it regulates a substantial amount of speech. *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982). First Amendment concerns are heightened in a case— such as this one—where "the overbroad statute imposes criminal sanctions." *Virginia* v. *Hicks*, 539 U.S. 113, 119 (2003) (citation omitted).

11

Congress passed the Anti-Riot Act in 1968, a year before the Supreme Court's decision in *Brandenburg* that sets out the test this Court must apply to determine whether the statute regulates a substantial amount of protected speech. 395 U.S. at 447. In *Brandenburg*, the leader of a Ku Klux Klan group was convicted under an Ohio syndicalism statute for "advocate(ing). . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform" and for "voluntarily assembl(ing) with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism." *Id.*

In setting forth the constitutional infirmity of this Ohio statute, the Court explained the history of First Amendment jurisprudence as setting forth "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. Like the statute reviewed in Brandenburg, the Anti-Riot Act "sweeps within its condemnation speech which our Constitution has immunized from government control." *See, Id.* at 448. In its attempt to curb public disorder during demonstrations, the Anti-Riot Act engulfs a brand range of behavior and does not require incitement to imminent lawless action.

12

Indeed, the law lacks any requirement that the regulated expression be constrained to imminent lawless action, or that the expression be likely to incite or produce such action. Instead, the Anti-Riot Act, like the Ohio Criminal Syndicalism statute, punishes the mere advocacy of violence. Worse still, the law punishes the use of commerce with the intent to merely advocate for violence, whether or not any violence ever occurs. Furthermore, criminal liability can hinge not on the actions of the speaker, but on how others react— potentially long after the Commerce Event.

*1.* <u>The law does not require that imminent violence follow the regulated speech or assembly.</u>

Because the statute punishes someone for engaging in a Commerce Event with the intent to carry out a prohibited Riot-Related Activity, instead of punishing Riot-Related Activities themselves, it immediately introduces a level of abstraction from any potential violence. As an initial matter, every court to interpret the statute has agreed that no riot need ever occur for criminal liability to attach. This, alone, calls into question whether the regulated speech is appropriately tied to imminent violent action. Because criminal liability does not depend on the actual occurrence of a riot, the statute does not require a causal relationship between the speech and ensuing violence that is the linchpin of *Bradenburg*'s imminence requirement.

13

The fact that the definition of "riot"—which is central to the Anti-Riot Act— fails to meet the *Brandenburg* requirement is one thing. Added to this is the fact that the Anti-Riot Act does not require any Riot-Related Activity ever occur, it merely requires that the accused "engaged or attempted to engage" in "any overt act for any purpose specified" as a Riot-Related Activity. The Seventh Circuit rewrote this particular aspect of the statute in its entirety by concluding that Congress intended to say that anyone who participates in a Commerce Event, intending to commit a Riot- Related Activity, and who actually commits that Riot-Related Activity, has violated the law. *Dellinger*, 472 F.2d at 361. And the Seventh Circuit did so consciously, and in recognition that without this redrafting of the statute, the law would not survive an overbreadth challenge. *Id.* at 362.

This Court should read the statute as it is drafted. The Anti-Riot Act requires a Commerce Event, with the requisite intent, and then "any other overt act" for "any purpose specified" as a Riot-Related Activity. Critically, the statute describes the Riot-Related Activities as "overt acts" in 18 U.S.C. § 2101(b). Therefore, the language "any other overt act" requires an interpretation that gives meaning to the words "any" and "other." In sum, Congress could have said that the Anti-Riot Act required as an element that: who either during the course of any such travel or use or thereafter performs any of the overt acts specified in

14

subparagraphs (A), (B), (C), or (D). But they did not. Instead, a violation of the Anti-Riot Act is complete upon the actual or attempted overt act, made to further the encouraging or promoting of a riot, that need never occur.

Finally, in the spirit of interpreting the statute as Congress actually wrote it, this Court need look no farther than the text of 18 U.S.C. § 2102(b) to confirm that the statute criminalizes mere advocacy, not imminent incitement. Instead of defining any of the Riot-Related Activities, this part of the statute explains that these terms "include[] but [are] not limited to, urging or instigating other persons to riot, *but shall not* be deemed to mean the mere oral or written (1) advocacy of ideas or (2) expression of belief, *not involving* advocacy of any act or acts of violence or assertion of the rightness of, or the right to commit, any such act or acts." 18 U.S.C. § 2102(b) (emphasis added). "A true negation of a negation is an affirmation, and a careful exclusion from an exclusion is at least likely to result in an inclusion." *Dellinger*, 472 F.2d at 363. Therefore, read literally, the statute includes "punishment for *mere* oral or written advocacy of an act of violence or assertion of the rightness of an act of violence. . . " *Id*. To avoid concluding that "the drafters of the double negative intended to make mere advocacy an offense," which "would render the statute invalid" the Seventh Circuit assumed that Congress intended the opposite of what it said, and that prosecutors could be trusted to reach the same conclusion. *Id.* at 364 ("any

15

possibility that prosecution would be undertaken in reliance" on the construction as drafted was "minimal"); *see also In re Shead*, 302 F. Supp. 560, 566 (N.D. Cal. 1969). The *Dellinger* court did not hide the fact that there was no support from the legislative history or the text of the statute to support this reading. *Id.* at 363.

Had Congress intended to carve-out mere advocacy of violence, it would have said so directly. The Anti-Riot Act was passed in 1968, before the Supreme Court held implicitly in *Brandenburg*, 395 U.S. at 447-48, and explicitly in *Hess*, 414 at 108-09 that the mere advocacy of violence is protected speech.

Contrasting the Anti-Riot Act with the Civil Disorder law passed at the same time is instructive. The Civil Disorder law prohibits someone from teaching or demonstrating any technique capable of causing injury to someone, knowing or intending that the technique would be used in furtherance of a civil disorder. 18 U.S.C. § 231. This comparatively narrow statute essentially proscribes teaching someone how to use violence while intending or knowing violence would occur at a public disturbance of three of more people that involved acts of violence causing "immediate danger." The Anti-Riot Act in comparison, covers so much protected speech and expression that Congress, confronted with this overbreadth, had to explicitly say that "[n]othing contained in this section shall be construed to make it unlawful for any person to travel in,

or use any facility of, interstate or foreign commerce for the purpose of pursuing the legitimate objectives of organized labor, through orderly and lawful means." 18 U.S.C. § 2101. But attempting to carve out only labor union strikes from the reach of the Act fails to adequately safeguard the vast sphere of speech and expressive conduct the First Amendment protects.

> *2.* The Anti-Riot Act does not require that criminal intent coexist with any act of violence, and also lacks a specific intent requirement.

In addition to its imminence problem, the Anti-Riot Act has an intent problem. To satisfy the standard for incitement, expressive conduct must be uttered with the specific intent "to produce . . . imminent disorder." *Hess v. Indiana*, 414 U.S. 105 at 109-10 (1973). In contrast, the Anti-Riot Act punishes anyone who travels or uses a facility of interstate commerce with intent to engage in Riot-Related Activities and who also "thereafter performs or attempts to perform any other overt act" as discussed above. 18 U.S.C. § 2101(a) (emphasis added). There is "no required causal relationship between the travel with intent and the riot actually incited" and "[n]o necessary connection whatsoever need be shown between them nor is there any time limitation as to when the overt act shall take place with relationship to the travel." *Dellinger*, 472 F.2d at 414 (Pell, J., dissenting). The result is that a defendant may be punished "at the federal level for what would otherwise be a local crime because at some time in his past he had crossed a state line or had used a facility of interstate commerce with nefarious

intent." *Id.*

This temporal attenuation is exacerbated because the Anti-Riot Act lacks the traditional Due Process requirement for a concurrence of *mens rea* and *actus reus.* The required criminal intent must only exist at the moment of travel, or when the email was sent, or credit card used (the Commerce Event). There is no intent requirement at the time of the later Actual or Attempted Overt Act. The result is that the statute allows the requisite criminal intent to be frozen at the moment of interstate travel or use of commerce, and that this is sufficient to infect any subsequent actions that could be committed without the specific criminal intent. As such, "[t]he bare convergence of evil intent and subsequent disorder can make acts of protected expression criminal." Kaufman, Henry R., *The Federal Riot Act and the First Amendment*, 5 Harv. C.R.-C.L. L. Rev 393 (1970).

This was a problem recognized at the time the law was passed. The breadth of the Act arising out of this particular flaw was pointed out by Representative Emanuel Celler, Chairman of the House Judiciary Committee at the time of the statute's enactment:

> The bill violates the due process clause in providing that intent and act do not coincide. The bill makes it a crime for an individual to cross a State line or to go from a foreign country to a State or to mail a letter with a certain intent to incite or encourage a riot. Afterward, even though he no longer has that same intent, if he commits some

overt act that could be construed as encouraging or promoting a riot or other public disturbance, he will have violated the law, although his crossing of the State line may have occurred months or even years before.

This violates a basic requirement of criminal law that the intent and the criminal act must be contemporaneous. It is clear the bill does not require any specific intent at the time of the overt act—only at the time of the crossing of the State line. How could a jury possibly establish this intent unrelated to a contemporaneous act is impossible to fathom.

113 CONG. REC. 19373 (1967) (remarks of Representative Emanuel Celler); *see also* Zalman, Marvin, The Federal Anti-Riot Act and Political Crime: The Need for Criminal Law Theory, 20 Villanova L. Rev. 897, 920 (1975).

But more troubling, the Anti-Riot Act punishes a speaker for creating a likelihood of a threat of conduct that in turn creates a risk or danger of harm. This scheme creates an attenuation problem that punishes speech and expressive conduct when the harm threatened is not imminent and is remote from the speech itself. This same attenuation problem doomed the boycott law at issue in *Claiborne Hardware Co.*. 458 U.S. at 928-29. A speech using "strong language" promoting boycotts during the Civil Rights era was constitutionally protected because the violence stemming from that speech occurred "weeks or months later." 458 U.S. at 928-29. And this attenuation was relevant in *Brandenburg* as well, with the Supreme Court finding that the activist's speech was protected partly because the actual acts of violence occurred weeks or months later. *Id*.

19

The result is simply that the criminal intent is not sufficiently tied to any later actual or threatened force or violence.

> 3. The range of protected speech regulated by the Anti-Riot Act is substantial.

The Anti-Riot Act is so overbroad and so immediately tied to First Amendment expression that there is a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984); *see also Williams*, 553 U.S. at 303.

In assessing the risk of a statute compromising recognized First Amendment protections, this Court can consider the history of the Government's "implementation" of the statute in evaluating this facial challenge. *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131(1992). And that history is constitutionally dubious: while most recently the Anti-Riot Act has been wielded against members of RAM, the Anti-Riot Act was passed in 1968 as part of the Civil Rights Act to give the federal government a "tool" to "reign in" protests against the Vietnam War and demonstrations that were a part of the civil rights movement for African Americans. In addition to the infamous "Chicago Seven" prosecution, members of the Black Liberation Movement were subpoenaed to testify before a grand jury for the Northern District of

California relating to alleged violations of the law.

The Anti-Riot Act plainly "operates in an area where there is substantial potential for abridgment of expression." *Dellinger*, 472 F.2d at 355-56 ( "We do not pretend to minimize the First Amendment problems presented on the face of this statute"). Overbreadth is established by showing a significant number of situations where a law could impair or restrict constitutionally protected speech. The plain language of the law could be violated by people on a regular basis, but only some people—those chosen by law enforcement in their discretion—are arrested. *See Houston v. Hill*, 482 U.S. 451, 466-67 (1987) (invalidating ordinance that criminalized interrupting police officers in performance of their duties because instead of providing the "breathing space" that "First Amendment freedoms need to survive," that ordinance could regularly be applied to protected expression). The persistence of electronic communication and ease with which individuals can communicate controversial positions through email, and social media, significantly expands the chilling umbrella of the Anti-Riot Act.

Furthermore, the Supreme Court has found sweeping breadth when a law attempts to predicate exposure to criminal punishment on how onlookers or other people will react to the speech or conduct, especially in the context of political demonstrations.

21

In *Coates v. Cincinnati*, the Supreme Court invalidated on both vagueness and overbreadth grounds an ordinance that criminalized "three or more persons to assemble…on any of the sidewalks…and there conduct themselves in a manner annoying to persons passing by." 402 U.S. 611, 614 (1971). This law was held unconstitutional as overly restricting political demonstrations. *Id.*

The Anti-Riot Act triggers the same constitutional infirmity. It criminalizes speech and expressive conduct—in part—communicated by people who have, or may, assemble, even in traditional public forums, based on how onlookers, spectators, counter-protestors, or other people present may react, or ultimately do react, thereby infringing and placing a chill effect on political demonstrations, a sphere at the core of First Amendment protections.

But what is more, it criminalizes activities a step away from actual violent or assaultive conduct by punishing travel or the use of interstate facilities with intent to incite, promote, or encourage a riot. The attenuated nexus between intent and harm means there is no fair warning and no clearly discernible standard to draw the line between lawful and felonious behavior, creating due process concerns. It would mean that the speaker in *Brandenburg* could not be punished for advocating acts of violence, but he could be punished for traveling across state lines with the intent to advocate for violence.

The established doctrine of prohibiting enforcement of vague laws "rests on the twin constitutional pillars of due process and separation of powers." *Sessions v. Dimaya,* 138 S.Ct. 1204, 1212-13 (2018). The due process test is essentially that a person of common intelligence must be able to discern what the law requires, what it proscribes, and what it permits. The separation of powers concern addresses the requirement that Congress draft the criminal laws, not the executive or the judiciary. If a law is sufficiently vague there is little hope of recognizing compliance or failure to comply with the dictates of the law short of resorting to the disparate interpretation of law-enforcement officials, prosecutors, and judges. As a result, citizens are subject to the potential of "the arbitrary deprivation of liberty interests." *City of Chicago v. Morales,* 527 U.S. 41, 52 (1999) (citing K*olender v. Lawson,* 461 U.S. 352, 358 (1983)). Ant-Riot Act language referring to 'public disturbance' and 'clear and present danger' are clear examples of unacceptable vagueness.

The Anti-Riot Act does not criminalize rioting. Instead, it makes behavior far- removed from engaging in an actual riot a federal crime. Pervasive ambiguities in each aspect of this complicated statute—including those within the very definition of "riot" itself—converge to result in a statute that does not provide guidance to an ordinary person about what constitutes, and what does not constitute, a federal crime. This substantial lack of clarity

allows unelected prosecutors and judges to define what counts as criminal behavior, instead of the Congress. The dearth of prosecutions under this statute over half a century establishes this point.

## II.    The Anti-Riot Act is unconstitutional as applied to Appellant Gillen.

Appellant argued to the district court that the Ant-Riot Act was unconstitutional as-applied to him. JA 101-107.  Any determination that a statute is constitutionally valid on its face does not resolve an as-applied challenge. *United States v. Moore* 666 F.3d. 313 (4th Circuit 2012).  In raising an as-applied challenge a litigant cannot rely on situations not before the Court or situations based on hypothetical scenarios of a person situated differently. *Id.,* at 319.

As noted, the prosecution in this case was grounded in demonstrations that took place in three separate locations on four separate dates.  Appellant has consistently maintained that he did not engage in any act of violence over the two-day demonstration in Charlottesville, Virginia or at the demonstration in Huntington Beach, California.  In fact Appellant asserts he conducted himself in a peaceable manner at the respective venues.  With the exception of the Berkley, California rally, it is noteworthy that the government did not attempt to contradict this.  At the rally in Berkeley, California, Appellant indeed engaged in violence against one person.  This is noted repeatedly in the record

before the Court, including in the Statement of Offense. JA 150. Suffice it to say, had the matter proceeded to trial Appellant would have offered evidence that the Berkeley, California incident was lawful and justified in so far as it was action undertaken in defense of another, albeit not action in self-defense. It is noteworthy that the district court to some extent took Appellant's conduct at the three events, or at least in Charlottesville, Virginia, into account in sentencing Appellant at the low-end of his sentencing guidelines, where two of his co-defendant's were sentenced at the high-end of their respective guidelines. JA 267. Appellant's counsel at sentencing described his conduct at the Charlottesville event of August 17, 2017 as "impressive", under the circumstances. The government did not take issue with this characterization. JA 265.

The subject of Appellant's action raises the question as to just what Appellant did to violate the Ant-Riot Act. The Court in *USA v. Miselis, et al.,* found certain components of the Act unconstitutional and severed that language from the Act, leaving the rest of the Act in place as valid law. It cannot be said that Appellant pled guilty to those portions of the Act left in place and not to the language that was struck. Was Appellant's mere presence with other RAM members sufficient to "encourage" others to act as they did? The Court in *United States v. Chapman,* found that where a defendant pleads guilty to an

indictment that alleges conjunctive and disjunctive parts of a statute, the defendant is deemed to have admitted to the least serious of the disjunctive statutory language. *United States v. Chapman,* 666 F.3d 220 (4th Cir. 2012). Certainly, "encouraging" or "participating in" could be deemed the least serious parts of the Act, and as the Court determined this language is indeed broader than other parts of the Act and can thereby encompass a broader range of behavior. It is also noteworthy that Appellant pled guilty to conspiring to violate the Ant-Riot Act and not to the substantive Act itself. Surely a conspiracy is quite akin to the concepts of urging, promoting, and encouraging though also akin to other parts of the Act deemed valid. This issue raises two additional questions. First, if Appellant were promoting or organizing a protest, how is he to know or anticipate that what ensues will be deemed a riot? Second, if the Ant-Riot Act is essentially an 'attempt' statute, what did Appellant attempt? The answers are not clear.

Additionally, the specific conduct of Appellant highlights the danger of the Anti-Riot Act lending itself to permitting a "Heckler's Veto." A primary factual pleading underpinning the governments' prosecution is that prior to entering the demonstration area Appellant, amongst others, applied athletic tape to his hands in order to prevent injury. A Heckler's Veto in essence criminalizes steps taken by a rally attendee in order to defend against a hostile

26

reaction. In Appellant's case, attendance at a rally with a valid permit did not guarantee he would not face a violent and determined opposition. Speech and assembly may therefore find themselves criminalized based upon how others react. At the Charlottesville, Virginia event of August 12, 2017, a large throng of individuals reacted violently. Appellant Gillen did not act, or react, violently. Though Appellant certainly engaged in a Commerce Event accompanied by several persons who did engage in violence once at the venue, his conduct distinguished itself from that of his fellow RAM members. Appellant's choice of persons with whom to assemble at the various events in question resulted in the application of the Ant-Riot Act to his assembly. In *Coates v. Cincinnati,* the Supreme Court examined a statute addressing the assembly of persons on a sidewalk who proved an annoyance to passersby. *Coates, Id*. Appellant maintains that the Anti-Riot Act subjects the right of free assembly to an unascertainable standard, as did the statute in *Coates.* While the statute in *Coates* was nothing if not succinct in its vagueness (i.e., "annoying to passersby"), the contrasting complexity of the Ant-Riot Act at once raises constitutional problems with respect to vagueness, due process, and the right of peaceable assembly. The complexity of the Anti-Riot Act heightens these problems and does not reduce them.

## CONCLUSION

For the reasons set forth herein, Appellant respectfully requests that the Court find the Anti-Riot Act unconstitutional on its face, reverse the judgment of the district court, and vacate Appellant's conviction and sentence. In the alternative, Appellant requests that the Court find the Anti-Riot Act unconstitutional as-applied to Appellant and vacate his conviction and sentence.

## ORAL ARGUMENT

In light of the Court's recent published Opinion in USA v. Miselis, et al., counsel leaves any scheduling of oral argument in the Court's discretion.

Respectfully submitted this 3rd day of February 2021.

S/ David A. Eustis
David A. Eustis
VSB # 48009
Eustis & Graham, PC
P.O. Box 2195
609 E. High Street
Charlottesville VA 22902
434-293-9900

## <u>CERTIFICATE OF COMPLIANCE</u>

1. The brief of the appellant has been prepared using Microsoft Word, Times New Roman font, 14 point proportional type size.

2. EXCLUSIVE of the table of contents, table of authorities, statement with respect to oral argument, any addendums, and the certificate of service, this brief contains <u>less than 30 pages</u> and is compliant with Fed. R. App. Pr. 32(a)(7)(B).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

February 3, 2021


                                 S/ David A. Eustis
                                 David A. Eustis
                                 VSB # 48009

## **CERTIFICATE OF SERVICE**

I certify that, on February 3, 2021, I electronically filed the foregoing

Opening Brief of Appellant with the Clerk of Court for the United States Court of

Appeals for the Fourth Circuit by using the CM/ECF system. The participants in

the case are registered CM/ECF users and service will be accomplished by the

appellate CM/ECF system.

I further certify, that on February 3, 2021, I served the Joint Appendix

Sealed Volume II, via USPS, on counsel listed below:

Laura D. Rottenborn
OFFICE OF THE UNITED
STATES ATTORNEY
Western District of Virginia
P. O. Box 1709
Roanoke, VA 24008


S/ David A. Eustis
David A. Eustis
VSB # 48009